IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


Olsen v. Taylor's Drain & Sewer Serv.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


Jason Olsen, appellant,

v.

Taylor's Drain and Sewer Service, Inc., et al., appellees.


Filed April 26, 2016.    No. A-15-542.


Appeal from the District Court for Lancaster County: Lori A. Maret, Judge. Affirmed.

Leonard W. Shefren, of Shefren Law Office, P.C., L.L.O., and Tara Gabrielson, Senior Certified Law Student, for appellant.

Randall L. Goyette and Stephen J. Schutz, of Baylor, Evnen, Curtiss, Grimit & Witt, L.L.P., for appellee Manzitto Builders, Inc.

Patrick R. Guinan, of Erickson & Sederstrom, P.C., for appellee PACAM, LLC.


Moore, Chief Judge, and Inbody and Bishop, Judges.

Bishop, Judge.

## I. INTRODUCTION

Jason Olsen was a laborer employed by Taylor's Drain and Sewer Service, Inc. (Taylor's), a plumbing company that installs water and sewer pipes to connect residences to city utilities. While working in a trench on one of Taylor's jobsites, Olsen was injured when one of the walls of the trench collapsed, burying him up to his neck in dirt. Olsen sued the general contractor, Manzitto Builders, Inc., also known as Manzitto Bros. (Manzitto), as well as PACAM, LLC, also known as Patriot Plumbing, Heating & Air Conditioning (Patriot), the subcontractor that hired Taylor's. The district court for Lancaster County entered summary judgment in favor of Manzitto and Patriot, and Olsen appeals. We affirm.

## II. BACKGROUND

Manzitto is a construction company in Lincoln, Nebraska, that primarily builds residential homes. In September 2012, it entered into a "New Home Residential Construction Agreement" with two individuals to construct a home on South 90th Street in Lincoln. The home was to be constructed on a lot owned by Manzitto, and possession was to transfer to the purchasers upon completion of construction. At an unspecified time during construction, Manzitto entered into an oral subcontract with Patriot for plumbing work. Patriot, in turn, entered into an oral subcontract with Taylor's to install water and sewer lines connecting to city utilities.

Taylor's began the work on March 22, 2013. Initially, two employees of Taylor's were on the jobsite, Danny Holland and another employee. Holland operated a backhoe owned by Taylor's and began digging a trench from the house to the street. The trench was approximately 8 to 10 feet deep, which was deeper than the home's foundation, because the water and sewer lines passed under the foundation's concrete footings.

After the employee assisting Holland had to leave the jobsite, three other Taylor's employees arrived; these were Daniel Bernneise, Aaron Saunders, and Olsen. Upon arriving, Olsen and Saunders entered the trench to begin fitting the pipes, while Bernneise supplied tools and materials from above. Holland continued extending the trench toward the street with the backhoe, some distance away from the men in the trench.

Saunders and Olsen first "stubbed" the sewer pipe out from the home. Olsen then walked down the trench to retrieve a length of sewer pipe. He was carrying the pipe back toward Saunders when one wall of the trench collapsed, burying Olsen to his neck in dirt. Saunders was unaffected by the cave-in.

One of Olsen's coworkers called emergency responders, who were able to extract Olsen and transport him to the hospital. Following the incident, the Occupational Safety and Health Administration (OSHA) issued citations and penalties against Taylor's for violating OSHA regulations, including those requiring protective systems to prevent cave-ins, daily inspections of excavation areas by competent persons, and safe means of egress from trenches during excavations.

On April 12, 2013, Olsen initiated this action against Taylor's, Manzitto, and Patriot in the district court. Olsen named Taylor's as a defendant due to its subrogation interest as Olsen's employer under the Nebraska Workers' Compensation Act. See Neb. Rev. Stat. § 48-118.01 (Reissue 2010).

In his amended complaint filed on March 10, 2014, Olsen alleged Manzitto and Patriot were negligent in that they (1) failed "to provide a safe premises to work for the employees of an independent contractor" and (2) failed "to exercise due care when an independent contractor's work involves special risks or dangers." Olsen alleged the defendants' negligence proximately caused his injuries. Manzitto and Patriot filed answers denying liability, and Manzitto filed a cross-claim against Patriot.

On May 22, 2014, Manzitto filed a motion for summary judgment on Olsen's amended complaint, and on May 27, Patriot did the same. On May 29, Olsen filed a motion for partial summary judgment on the issue of defendants' liability.

A hearing on the summary judgment motions was held on June 27, 2014. Manzitto offered into evidence the depositions of Tyler Wentz, the president of Patriot; Matthew Taylor, president of Taylor's; Olsen; Holland; and Bernneise. (We will refer to Matthew Taylor as "Matthew" to avoid confusion with Taylor's.) Manzitto also offered affidavits from Sam Manzitto, president of Manzitto, and Derrill Grabenstein, a Manzitto employee who served as the project manager for the job on which Olsen was injured. In addition to relying on the depositions offered by Manzitto, Patriot offered into evidence Grabenstein's deposition and Manzitto's answers to Patriot's second set of interrogatories.

Olsen relied upon defendants' exhibits but also offered into evidence the affidavit of Douglas Schneider, a former OSHA employee with knowledge of trenching safety; photographs of the trench in which Olsen was injured; the OSHA citations issued to Taylor's; the "New Home Residential Construction Agreement" executed between Manzitto and the purchasers; Manzitto's "Corporate Safety Procedures"; Patriot's invoices to Manzitto; Taylor's answers to Olsen's interrogatories; and Manzitto's answers to Olsen's interrogatories. We discuss the relevant details of the parties' summary judgment exhibits in our analysis section below.

After the district court received the parties' exhibits into evidence and heard argument, it took the matter under advisement. On February 9, 2015, the court entered a written order granting summary judgment in favor of Manzitto and Patriot on Olsen's amended complaint. The court noted that based on "[a]dditional briefing" (not in the record before us), it appeared that in addition to the two theories of liability alleged in Olsen's amended complaint, Olsen intended to pursue the theory that Manzitto and Patriot retained control over the work performed by Taylor's and was negligent in exercising that control.

Addressing each theory of liability, the court reached the following conclusions: (1) neither Manzitto nor Patriot retained sufficient control over Taylor's work to give rise to a duty to Taylor's employees; (2) although Manzitto as general contractor and property owner had a duty to provide a safe place to work for employees of independent contractors, Olsen's injuries were not caused by an unsafe condition of the premises; (3) as a subcontractor who did not exercise control over the jobsite as a whole, Patriot did not have a duty to provide a safe place to work for employees of subcontractors; (4) there was no statute or rule imposing a specific duty on Manzitto or Patriot with regard to Taylor's work; and (5) under *Gaytan v. Wal-Mart*, 289 Neb. 49, 853 N.W.2d 181 (2014), the "special risks or dangers" theory of liability did not apply to negligence claims by employees of subcontractors against general contractors or owners.

Olsen appealed the district court's February 9, 2015, order, but on March 31, 2015, in case No. A-15-175, this court dismissed the appeal for lack of jurisdiction pursuant to Neb. Ct. R. App. § 2-107(A)(2), because the order did not dispose of all of the claims of all of the parties. On June 17, 2015, the district court dismissed Manzitto's cross-claim against Patriot with prejudice, and dismissed Olsen's amended complaint with prejudice as to all parties. Olsen timely appealed to this court.

### III. ASSIGNMENTS OF ERROR

Olsen assigns that the district court erred in concluding as a matter of law that no genuine issue of material fact exists as to whether (1) Manzitto or Patriot retained control over the work

performed by Taylor's and (2) Manzitto or Patriot breached its nondelegable duty to provide a safe place to work.

## IV. STANDARD OF REVIEW

Summary judgment is proper when the pleadings and evidence admitted at the hearing disclose no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *New Tek Mfg. v. Beehner*, 275 Neb. 951, 751 N.W.2d 135 (2008).

Whether a legal duty exists for actionable negligence is a question of law dependent on the facts in a particular case. When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusions reached by the trial court. *Eastlick v. Lueder Constr. Co.*, 274 Neb. 467, 741 N.W.2d 628 (2007).

## V. ANALYSIS

In order to prevail in a negligence action, a plaintiff must establish the defendant's duty to protect the plaintiff from injury, a failure to discharge that duty, and damages proximately caused by the failure to discharge that duty. *Id.* The Nebraska Supreme Court recently outlined the law applicable to negligence actions by employees of independent contractors against entities that hire those contractors to perform work:

> Generally, one who employs an independent contractor is not liable for physical harm caused to another by the acts or omissions of the contractor or its servants. This is the general rule, because an employer of an independent contractor generally has no control over the manner in which the work is to be done by the contractor, so the contractor, rather than the employer, is the proper party to be charged with the responsibility of preventing the risk and bearing and distributing it.
>
> Our case law has recognized four exceptions to the general rule. Specifically, an employer of an independent contractor can be liable for physical harm caused to another if (1) the employer retains control over the contractor's work, (2) the employer is in possession and control of premises, (3) a statute or rule imposes a specific duty on the employer, or (4) the contractor's work involves special risks or dangers. We often refer to the latter three exceptions as involving "nondelegable" duties. A nondelegable duty means that an employer of an independent contractor, by assigning work consequent to a duty, is not relieved from liability arising from the delegated duties negligently performed.

*Gaytan v. Wal-Mart*, 289 Neb. 49, 57-58, 853 N.W.2d 181, 192 (2014).

Olsen argues the first two exceptions to the general rule apply to his negligence claims against Manzitto and Patriot. He indicates he is not pursuing the third and fourth exceptions, because there does not appear to be any statute or rule imposing a specific duty on either defendant, and because the court in *Gaytan* held the fourth exception is inapplicable to claims by employees

- 4 -

of independent contractors against general contractors or owners. See *id*. Accordingly, we address the applicability of the first two exceptions to each defendant.

### 1. CONTROL OVER WORK

When a general contractor or owner retains control over an independent contractor's work, the general contractor or owner has a duty to use reasonable care in taking measures to prevent injuries to workers. *Gaytan, supra*. See, generally, Restatement (Second) of Torts § 414 (1965). However, for such a duty to arise, the general contractor or owner must have (1) supervised the work that caused the injury to the employee, (2) had actual or constructive knowledge of the danger which ultimately caused the injury, and (3) had the opportunity to prevent the injury. *Gaytan, supra*. See, also, Restatement (Second), *supra*, § 414, comment b. The control must culminate in the ability to dictate the manner in which work is performed, not merely a general right to start and stop work, inspect progress, or make suggestions which need not be followed. *Gaytan, supra*. See, also, Restatement (Second), *supra*, § 414, comment c. To determine whether the control-of-work exception applies, courts look to the language of any applicable contract and the actual practice of the parties. *Gaytan, supra*.

### (a) Manzitto

Olsen argues Manzitto retained control over Taylor's work so as to give rise to a duty to Taylor's employees. According to Olsen, Manzitto as general contractor "was responsible for supervising the work completed on the site, had knowledge about the potential dangers caused by improper trenching techniques, and had the opportunity to prevent Olsen's injuries by ensuring that trenching was performed to OSHA standards." Brief for appellant at 10. Olsen argues that, although Manzitto was not on the jobsite on the day of the accident and "may not have known about the work being done" that day, it "should have been aware of when its subcontractors were on the job and should have informed itself of the manner in which its subcontractors did their work to assure it was safe and being completed to OSHA standards." *Id*. at 15.

At this point, we observe that the control-of-work exception typically applies to claims by employees of subcontractors against general contractors or owners. See *Gaytan, supra*. In this case, Patriot was a subcontractor, and Taylor's was a "sub-subcontractor," with no contractual relationship with Manzitto. Grabenstein stated in his affidavit that prior to Olsen's accident, he was unaware Patriot had subcontracted work to Taylor's; Sam Manzitto's affidavit indicated the same. Assuming without deciding that the control-of-work exception may apply to claims by employees of sub-subcontractors against general contractors, we address whether the requirements for the exception have been satisfied.

We first look to any relevant contractual provisions. Olsen seems to agree that the oral subcontracts between Manzitto and Patriot and between Patriot and Taylor's provide no assistance, as there was no evidence of their terms. Instead, Olsen contends the "New Home Residential Construction Agreement" between Manzitto and the purchasers constituted evidence that Manzitto "had the ability to dictate the way in which the work provided by Taylor's was performed." Brief for appellant at 12. He cites, among other provisions, the provision granting Manzitto exclusive control over the "means, methods, and procedures of construction." *Id*. at 11.

However, Manzitto's agreement with the purchasers allocated authority between Manzitto and the purchasers, not between Manzitto and its subcontractors or any other entities. See *Eastlick v. Lueder Constr. Co.*, 274 Neb. 467, 741 N.W.2d 628 (2007) (although contract between owner and general contractor gave general contractor control of the jobsite, this did not mean general contractor retained control of subcontractor's work). Thus, if there is any evidence that Manzitto retained control over Taylor's work, it must be found in the parties' conduct, not in any contractual provision. The primary evidence relevant to this issue is Grabenstein's testimony, which we summarize first.

Grabenstein testified that his duties as project manager consisted of "scheduling, working with the budget, work with the homeowner, change orders, basically, supervising the construction of the house in general." He explained that Manzitto subcontracted 99% of its work, and Grabenstein would coordinate the subcontractors and walk around the project to see what work had been done and what work needed to be done. He also inspected subcontractors' work as it progressed to "verify it was in line with the specs, things were going in the right spots, done in a quality workmanship manner." Sometimes, Grabenstein was on the jobsite two or three times per day, sometimes he was there all day, and other days he was not on the jobsite at all.

Grabenstein testified that once the home's foundation was completed, he would let the plumbing subcontractor know that the water and sewer lines could be installed "anytime"; it was then up to the subcontractor to schedule the work. He explained that trenching was not "on the critical path" and whether it was completed two weeks earlier or two weeks later would "make no difference in completion of the job in general."

According to Grabenstein, he had general knowledge of trenching but was not an expert; he knew the trench for the water and sewer lines was typically deeper than the footings, which in this case was approximately 9 feet. Asked how he would have responded to a hypothetical scenario, Grabenstein said that if he had been on the site and had seen the trench was only 4 feet deep, he would have called Patriot to discuss the matter. He believed he would have had the authority to order Patriot to dig deeper.

Grabenstein further testified he had general knowledge of what needed to be done to comply with OSHA regulations for trenching. According to Grabenstein, there needed to be "competent people above and below," escape ladders every 25 feet, "benching" consisting of a 2-foot wide "step" for each 4 or 5 feet of depth, and "sloping" in some cases. He believed trenching was dangerous and that it was important people were trained in the proper methods. However, Grabenstein explained Manzitto relied on its subcontractors to train their own employees; it did not require any specific training of subcontractors performing trenching work.

Grabenstein testified that if he was on the jobsite and saw someone doing something unsafe, he would put a stop to it. He explained that prior to working for Manzitto, he operated his own residential construction company for 15 years. During that time, if he saw someone trenching without complying with benching and sloping requirements, he would shut the site down. He believed he had the same authority at Manzitto.

Grabenstein also discussed Manzitto's safety policies and practices in general. According to Grabenstein, Nick Manzitto served as Manzitto's safety coordinator; however, Nick had never instructed him to conduct safety inspections on a regular basis. Instead, if Grabenstein was on a

job and saw something unsafe, he would put a stop to it. Grabenstein further testified that Manzitto's project managers had biweekly meetings, and a portion of each meeting was set aside for a different safety topic.

Grabenstein acknowledged Manzitto's "Corporate Safety Procedures" manual, which was received into evidence at the summary judgment hearing. The manual stated, "It is the intent of Manzitto, Inc. to comply with all laws. To do this, we must constantly be aware of conditions in all work areas that can produce injuries." The manual then set forth the objectives and components of a "Safety and Health program," including requirements for training employees on safe work practices.

Addressing the day of Olsen's accident, Grabenstein testified he was not on the jobsite on that day. He explained that, normally, Patriot would tell him when the various stages of its work were in the process of being completed; however, no one informed him the trenching was going to be performed on that day. In fact, according to Grabenstein, Manzitto was "experiencing ice and frozen ground and the job was actually at a relative standstill."

In addition to Grabenstein's testimony, portions of the testimony of Wentz, Matthew, and Holland are relevant to whether Manzitto retained control over Taylor's work. According to Wentz, Manzitto did not provide any specs for how the trenching was to be performed, and Manzitto did not say when the trenching needed to be done. Matthew testified that at the time Taylor's did the trenching, Matthew did not know who the homebuilder was; he did not have any dealings with Manzitto at all. Holland, who actually dug the trench, testified he never spoke with Grabenstein and that no one told him anything regarding how to do the job. The only instruction he received was from Matthew to dig the trench.

Because this is an appeal from a grant of summary judgment, we must view the above evidence in a light most favorable to Olsen and give him the benefit of all reasonable inferences deducible from the evidence. *New Tek Mfg. v. Beehner*, 275 Neb. 951, 751 N.W.2d 135 (2008). Having reviewed the evidence in this manner, we agree with the district court's determination as a matter of law that the control-of-work exception is inapplicable to Olsen's claim against Manzitto, as we now explain.

### i. Supervision

The first requirement for application of the control-of-work exception is that the defendant have supervised the work that caused the employee's injury. *Gaytan v. Wal-Mart*, 289 Neb. 49, 853 N.W.2d 181 (2014). Grabenstein's testimony indicated that Manzitto, as general contractor, had control of the jobsite generally, but this does not mean the control-of-work exception applies here. In *Eastlick v. Lueder Constr. Co.*, 274 Neb. 467, 741 N.W.2d 628 (2007), a general contractor had control of the jobsite as a whole, but this did not mean it controlled the manner of work of its masonry subcontractor. Thus, when the subcontractor's employee was injured while working on scaffolding owned, maintained, erected, and dismantled by the subcontractor, the control-of-work exception was inapplicable. *Id.*

Here, while Manzitto exercised authority over the jobsite as a whole, it did not necessarily retain control over the manner of each subcontractor's work, especially Taylor's. Manzitto did not supervise Taylor's trenching work in any manner on the day of Olsen's accident, and there was no

contractual provision or course of conduct suggesting Manzitto had an obligation to do so. Rather, without receiving any instruction from Manzitto or even notifying Manzitto it would be on the jobsite, Taylor's performed the trenching work using its own backhoe, tools, and employees. When one of Taylor's employees, who had no formal training in proper trenching techniques, dug the trench in an unsafe manner, the trench collapsed, injuring Olsen. Under these circumstances, there is no genuine issue of material fact as to whether Manzitto supervised the work that caused Olsen's injuries.

The provisions of Manzitto's "Corporate Safety Procedures" do not alter our conclusion. While the procedures state that it is the "duty of the Safety Coordinator to assist the Supervisor/Foreman . . . [in] [c]onducting safety inspections on a periodic basis," nothing in the procedures addresses supervision of subcontractors' work or of trenching specifically. Rather, the procedures are focused on the safety of Manzitto's employees. Therefore, the "Corporate Safety Procedures" do not alter our conclusion that there is no genuine issue of material fact with respect to Manzitto's supervision of Taylor's work.

## ii. Knowledge of Danger

The second requirement for the control-of-work exception is that the defendant have actual or constructive knowledge of the danger which ultimately caused the injury. *Gaytan, supra*. There is no evidence Manzitto had actual knowledge of the dangers posed by the trench that Holland dug, since it is undisputed Manzitto had no notice Taylor's would be trenching that day and no one from Manzitto was on the jobsite. If Manzitto had knowledge of the danger, it had to be constructive knowledge.

"Constructive knowledge is generally defined as '[k]nowledge that one using reasonable care or diligence should have . . . .'" *Gaytan v. Wal-Mart*, 289 Neb. 49, 62-63, 853 N.W.2d 181, 195-96 (2014), quoting Black's Law Dictionary 1004 (10th ed. 2014). In *Gaytan, supra*, the Nebraska Supreme Court held there was a genuine issue of material fact as to whether a general contractor had constructive knowledge of the danger posed by a subcontractor's failure to use personal protective equipment (PPE) while on a building's roof, even though the general contractor's employees did not have access to the roof. This was because prior to the accident, the general contractor monitored the subcontractor's employees on a number of occasions to ensure they were wearing PPE. *Id*. Furthermore, there was evidence that the subcontractor's failure to use PPE was so widespread on the day of the accident that the general contractor should have known of it. *Id*.

Here, there was no evidence Manzitto monitored the use of safe trenching practices on the jobsite prior to the accident. Moreover, no representatives of Manzitto were on the jobsite on the day of the accident, likely because neither Taylor's nor Patriot notified Manzitto that the trenching would be taking place. Simply because Grabenstein had knowledge of proper trenching techniques and of the dangers of trenching generally does not mean he had constructive knowledge of the dangers posed by the trench Holland excavated. There was no evidence Grabenstein had reason to anticipate that Taylor's employees would not follow proper OSHA trenching techniques, especially considering that no one informed Manzitto of Taylor's involvement in the project.

Olsen references testimony regarding frozen ground at the jobsite and the presence of water in the basement and trench in the days following the accident. In particular, Grabenstein testified that at the time of Olsen's accident, Manzitto was "experiencing ice and frozen ground and the job was actually at a relative standstill." Grabenstein believed that prior to Olsen's accident, he had spoken with Patriot about "ground conditions" going from "frozen to muddy" and that they had to be "rectified before we could continue on with the basement." In addition, Holland testified that although there was no water in the trench on the day of Olsen's accident, when he returned to the jobsite a day or two later, the trench was flooded with water. He testified that when he returned to the jobsite in the days following the accident, a company was there to pump water out of the basement; the company also pumped water out of the trench.

While Olsen suggests that the frozen or muddy ground and presence of water after the accident meant Manzitto knew the ground was "possibly unsafe for work," brief for appellant at 16, this is a red herring. There is no evidence that frozen or muddy ground was the danger that caused Olsen's injuries, or that the ground conditions would have rendered OSHA-compliant trenching techniques ineffective at ensuring Olsen's safety. In other words, no danger existed until Holland excavated the trench without complying with OSHA regulations; this is true whether or not the ground was frozen or muddy. Thus, Grabenstein's knowledge of the ground conditions did not constitute evidence of actual or constructive knowledge of the danger which caused Olsen's injuries.

### iii. Opportunity to Prevent Injury

The third requirement for the control-of-work exception is that the defendant have the opportunity to prevent the injury. *Gaytan v. Wal-Mart*, 289 Neb. 49, 853 N.W.2d 181 (2014). Olsen contends Manzitto could have prevented the accident "by making itself knowledgeable about what was going on at the site that it was fully responsible for" and by telling "the workers to stop trenching because the job was being done dangerously." Brief for appellant at 16. Even overlooking that Taylor's gave no notice to Manzitto that it would be trenching on the day of the accident, the mere ability to order a subcontractor to stop unsafe work is insufficient to invoke the control-of-work exception. As one court explained:

> Having the right to stop unsafe work is not enough to create a duty of care. *Dow Chem. Co. v. Bright*, 89 S.W.3d 602, 608, 46 Tex. Sup. Ct. J. 35 (Tex. 2002). A general contractor or an employer is not required to stand idly by while another is injured or killed in order to avoid liability. *Id*.

*Transit Mix Concrete & Materials Co. v. Johnson*, 205 S.W.3d 92, 95 (Tex. App. 2006).

While Manzitto may have been in a position to stop Taylor's unsafe work had it been on the jobsite, this does not mean Manzitto had an "opportunity to prevent the injury" as required for the control-of-work exception. There is no evidence Manzitto required Taylor's to comply with specific trenching procedures and then negligently ignored an opportunity to ensure the procedures were followed. See *Gaytan, supra* (applying the control-of-work exception where general contractor monitored PPE use but failed to do so on day of accident when lack of PPE use was widespread).

*iv. Conclusion as to Manzitto's Control of Work*

Viewing the evidence in a light most favorable to Olsen and giving him the benefit of all reasonable inferences, there is no genuine issue of material fact as to whether the requirements for the control-of-work exception have been satisfied as to Manzitto. Therefore, the district court correctly held that Manzitto as a matter of law cannot be liable to Olsen under this exception.

(b) Patriot

We now turn to Olsen's claim that Patriot retained control over Taylor's work so as to give rise to a duty to Taylor's employees. According to Olsen, as the subcontractor that hired Taylor's, Patriot supervised Taylor's work, had knowledge of "the dangers of the job site," and had the opportunity to prevent Olsen's injuries. Brief for appellant at 17. Olsen contends that although Patriot was not on the jobsite, Patriot had the authority to "evaluate" Taylor's work and "require changes." *Id*. at 19. Similar to his argument against Manzitto, Olsen argues that "[h]ad Patriot been on site on the day of the accident, it could have observed the manner in which the trenches were being dug and, under its authority, could have guaranteed that safety guidelines were being met." *Id*. at 20.

At this point, we again observe that the control-of-work exception typically applies to claims by employees of subcontractors against general contractors or owners. Assuming without deciding that it may also apply to claims by employees of sub-subcontractors against subcontractors, we address whether the requirements for the exception have been satisfied.

As with Olsen's claim against Manzitto, if there is any evidence that Patriot retained control of Taylor's work, it must be found in the parties' conduct, not in the terms of the oral subcontract between Patriot and Taylor's, as there was no evidence of the subcontract's terms. The evidence of the parties' conduct consisted primarily of the deposition testimony of Wentz, Matthew, Holland, Olsen, and Bernneise, which we now summarize.

Wentz testified that although Patriot included connection of water and sewer services in its bids for plumbing work, it never performed trenching itself and did not own a backhoe. Patriot used a number of different subcontractors for trenching, including Taylor's. Wentz estimated that in 2012 and 2013, Patriot subcontracted trenching to Taylor's on 100 to 150 homes, including the home on South 90th Street. Under normal circumstances, Wentz would expect Taylor's to finish its work within 48 hours of his request. Wentz was not trained in trenching techniques and had never dug a trench himself. Patriot had one employee who completed an OSHA class 4 or 5 years ago; however, Wentz did not specify whether the class covered trenching. Wentz did not supervise trenching, but if he was on a jobsite and saw someone doing something unsafe, he would stop work.

Matthew testified that Taylor's oral subcontract with Patriot consisted of Wentz calling him on the phone and giving him an address. He received no other instructions from Patriot, because "everything else is self-explanatory"; there was no need for anyone to tell him how to do the job. Normally, Matthew completed the water and sewer line installations within "48 business hours," or approximately one week, of receiving the call from Wentz. All tools for the work were supplied by Taylor's. Matthew testified he had no formal training in trenching prior to the incident; he had only on-the-job, hands-on training.

- 10 -

Holland testified the only instruction he received was from Matthew to dig the trench; no one told him anything regarding how to do the job. Holland further testified that although he had 16 years' experience with trenching prior to the incident, he never had any training in proper trenching techniques, such as how to "shore up a trench." Prior to the accident, he had seen trenches collapse, but no one had been injured. Holland testified that no one from Patriot was on the jobsite on the day of the accident.

Olsen likewise testified that no one from Patriot or Manzitto was on the jobsite on the day in question. Olsen further testified that he did not expect to see anybody from Patriot at the jobsite, although Patriot employees were usually on jobsites when Taylor's was there. According to Olsen, who had worked for Taylor's for approximately 2 months prior to the accident, Patriot employees would "lay out which way the plumbing's going to go" by painting a line on the ground. Patriot employees also inspected the work as it progressed, telling Taylor's employees to dig deeper or checking if the slope of the pipe allowed for drainage. When asked if he had observed a Patriot employee telling someone from Taylor's about the need to slope the sides of a trench, Olsen responded that he did not "dig the trench" and "never pa[id] attention to that." Olsen only knew "what happened in the trench"; he did not know what anyone told Holland about digging the trenches.

Bernneise testified that Patriot did not tell Taylor's how to do its job. Bernneise believed that during the 3 months he had worked for Taylor's prior to the accident, he had "probably" talked to someone from Patriot, but he did not recall Patriot ever telling Taylor's employees how to do their jobs.

Again, we must view the evidence in a light most favorable to Olsen and give him the benefit of all reasonable inferences deducible from the evidence. *New Tek Mfg. v. Beehner*, 275 Neb. 951, 751 N.W.2d 135 (2008). Having reviewed the evidence in this manner, we agree with the district court's determination as a matter of law that the control-of-work exception is inapplicable to Olsen's claim against Patriot, as we now explain.

### i. Supervision

The first requirement for application of the control-of-work exception is that the defendant have supervised the work that caused the injury to the employee. *Gaytan v. Wal-Mart*, 289 Neb. 49, 853 N.W.2d 181 (2014). Here, it is undisputed Patriot was not on the jobsite on the day of Olsen's accident. Olsen's testimony that during his 2 months working for Taylor's, he had received directions from Patriot employees on other jobsites regarding the location of plumbing or the depth and slope of sewer pipes, does not mean Patriot supervised the trenching that resulted in his injury. Importantly, Olsen testified that he only knew "what happened in the trench" and did not know what anyone told Holland about digging trenches; thus, even overlooking the fact that Patriot was not on the jobsite on the day of the accident, Olsen had no personal knowledge of Patriot supervising trenching safety specifically. Therefore, Olsen's testimony did not contradict the testimony of Wentz, Matthew, and Holland that Patriot did not provide instructions with respect to trenching. Consequently, there is no genuine issue of material fact as to whether Patriot supervised Taylor's trenching on the day of the accident.

### ii. Knowledge of Danger

The second requirement for the control-of-work exception is that the defendant have actual or constructive knowledge of the danger which ultimately caused the injury. *Gaytan, supra*. As we concluded with respect to Manzitto, there is no genuine issue of material fact as to Patriot's actual or constructive knowledge, since it is undisputed Patriot was not on the jobsite on the day of the accident and did not observe the trenching that caused Olsen's injuries. Although Olsen suggests Patriot should have been on the jobsite and "should have made sure that the trenches were being dug safely," brief for appellant at 20, he cites no authority and provides no explanation for why this is so. There was no evidence of any contractual duty or course of conduct between the parties establishing such an obligation. Furthermore, as we explained with respect to Manzitto, Patriot's alleged knowledge of the frozen or muddy ground did not constitute knowledge of the danger that caused Olsen's injury.

### iii. Opportunity to Prevent Injury

The third requirement for the control-of-work exception is that the defendant have the opportunity to prevent the injury. *Gaytan, supra*. Again, Olsen contends that, "[h]ad Patriot been on site on the day of the accident, it could have observed the manner in which the trenches were being dug and, under its authority, could have guaranteed that safety guidelines were being met." Brief for appellant at 20. Even overlooking that Patriot had no obligation to be on the jobsite on the day of the accident, there is no evidence to support Olsen's claim that Patriot had the "authority" to ensure "that safety guidelines were being met." *Id*. Although Wentz testified he would stop work if he was on a jobsite and observed work being done in an unsafe manner, as we explained above, this is not sufficient to invoke the control-of-work exception. *See Transit Mix Concrete & Materials Co. v. Johnson*, 205 S.W.3d 92, 95 (Tex. App. 2006) ("[h]aving the right to stop unsafe work is not enough to create a duty of care").

### iv. Conclusion as to Patriot's Control of Work

Viewing the evidence in a light most favorable to Olsen and giving him the benefit of all reasonable inferences, there is no genuine issue of material fact as to whether the requirements for the control-of-work exception have been satisfied as to Patriot. Therefore, the district court correctly held that Patriot as a matter of law cannot be liable to Olsen under this exception.

Before we move past the control-of-work exception, we note that the affidavit of Schneider, the former OSHA employee, asserts that "[t]he general contractor and Patriot should have ensured that a trenching and excavation program was in place and communicated to all employees and subcontractors." At the summary judgment hearing, Manzitto and Patriot objected to Schneider's affidavit on grounds that he was not qualified as an expert and that the affidavit included legal conclusions. At the hearing, the court took admission of the affidavit under advisement, and the record contains no subsequent ruling on its admissibility. Nevertheless, even assuming Schneider was qualified as an expert, we agree that Schneider's conclusions as to questions of law were inadmissible, including his unsupported assertion that the defendants had a duty to establish a "trenching and excavation program." See *Kaiser v. Western R/C Flyers*, 239 Neb. 624, 477 N.W.2d 557 (1991) (expert testimony concerning a question of law is generally not admissible in evidence).

See, also, *Eastlick v. Lueder Constr. Co.*, 274 Neb. 467, 741 N.W.2d 628 (2007) (whether a legal duty exists for actionable negligence is a question of law). Therefore, Schneider's affidavit does not alter our conclusion that neither defendant owed a duty to Olsen under the control-of-work exception.

## 2. CONTROL OF PREMISES

We now turn to the second exception Olsen invokes. The Nebraska Supreme Court has recognized that one in possession and control of premises has a duty to provide a safe place to work for an independent contractor's employees. *Gaytan v. Wal-Mart*, 289 Neb. 49, 853 N.W.2d 181 (2014). This exception is distinct from the control-of-work exception, as the duty to provide a safe workplace relates to the physical condition of the premises, not to the manner in which work is done. *Id*. A general contractor or owner does not have to retain control of work in order to have a duty to provide a safe place to work. *Id*.

### (a) Manzitto

There is no dispute that Manzitto, as owner and general contractor who maintained possession and control of the premises, had a duty to provide a safe place to work for the employees of its independent contractors. However, the district court found that although Manzitto had such a duty, there was no genuine issue of material fact as to whether Olsen's injuries were caused by an unsafe condition of the premises. We agree.

In *Gaytan, supra*, the subcontractor's employee was killed when, without wearing PPE, he stepped onto an improperly installed decking sheet outside of the controlled decking zone on the roof, and the decking sheet gave way. The Nebraska Supreme Court held that although the general contractor maintained possession and control of the premises, and thus had a duty to provide a safe place to work, the subcontractor's employee was not injured because there was something unsafe about the workplace premises. *Id*. Rather, "he was injured due to specific actions or inactions involved in the construction process." *Id*. at 67, 853 N.W.2d at 198. Thus, any breach of the general contractor's duty to provide a safe place to work did not cause the injuries.

Here, like the employee's injuries in *Gaytan*, Olsen's injuries were not caused by something unsafe about the worksite premises over which Manzitto maintained possession and control. Instead, the evidence was that Taylor's failure to comply with OSHA regulations for trenching resulted in the collapse of the trench that injured Olsen. Taylor's was the only entity that received citations and penalties from OSHA, and the citations were for Taylor's failure to use protective systems to prevent cave-ins, conduct daily inspections of excavation areas by competent persons, and provide safe means of egress from trenches during excavations. These requirements pertained to ensuring safety during the process of excavating a trench and installing sewer and water lines. In other words, Olsen was injured due to actions or inactions during the excavation process, not due to Manzitto's failure to provide a safe place to work. In sum, there is no genuine issue of material fact as to whether any breach of Manzitto's duty to provide a safe place to work resulted in Olsen's injuries; therefore, the district court correctly held that Manzitto as a matter of law cannot be liable to Olsen under this exception.

### (b) Patriot

As stated, an owner or a general contractor in possession and control of premises has a duty to provide a safe place to work to employees of independent contractors. *Gaytan v. Wal-Mart*, 289 Neb. 49, 853 N.W.2d 181 (2014). However, Patriot was a subcontractor, not an owner or general contractor in possession and control of premises, so it would seem that such a duty does not extend to it, as the district court determined.

Nevertheless, we need not decide this issue, because as we just explained, there is no genuine issue of material fact as to whether Olsen's injuries were caused by an unsafe condition of the premises. Rather, his injuries were caused by Taylor's actions or inactions during the trenching process. Therefore, the district court correctly held that Patriot as a matter of law cannot be liable to Olsen under this exception.

### VI. CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court for Lancaster County.

AFFIRMED.